May it please the Court, Therese Day for the appellant, Robert Poyson. In McKinney v. Ryan, this Court, sitting on Bank, held that for a period of approximately 15 years, from the late 1980s and continuing through the mid-2000s, the Arizona Supreme Court consistently applied an impermissible causal nexus test to non-statutory mitigating evidence in violation of aidings. The Court found that as a matter of Arizona state law, non-statutory mitigating evidence was only considered relevant mitigation if the defendant was able to establish a causal connection between the mitigating evidence and the defendant's behavior during the commission of the crime. The Court also explicitly overruled the Ninth Circuit's panel decision in Shad v. Ryan, finding that their indication rule announced in Shad was an inappropriate and unnecessary loss on the deference already required under the ADPA. Mr. Poyson's case fell within its relevant time period, and the evidence error that occurred in his case occurred both in the sentencing court and in the Arizona Supreme Court. This was the basis for one of Mr. Poyson's claims in his appeal before this panel, where he argued that the Arizona State Courts failed to properly consider and give effective evidence for his chaotic and abusive childhood, his mental health issues, and his long history of alcohol and substance abuse. The majority of his panel specifically found that the records showed that peers of the Supreme Court applied a causal axis to this evidence. However, the records did not reveal whether they were doing it as a matter of just weight or an impractical screening mechanism. The panel found rec use. I thought that the trial judge had found that it was just vague allegations, and they didn't give it weight on that account, not because of any causal mixes. I think that... You're talking about the sentencing court, Judge Acuna? I think that it was a little bit muddled. I think that the Court did say vague allegations, but when you're looking at the language it was talking about, it was conflating both statutory and non-statutory mitigating evidence. And if you look at... There's language about vague allegations, but also there's language regarding the causal axis if you look at VR 864 to 866. And I know that it became a stronger argument or a stronger point, I guess you could say, when the Arizona Supreme Court looked at it, because the Arizona Supreme Court glossed over the sentencing court's use of the causal axis as to each point of all of these mitigating factors. And so I do believe that the Court did apply a causal axis to some extent to evidence of substance abuse, so it was less strong than the evidence related to mental health and sexual childhood. Well, it would appear that the sentencing judge did apply a causal axis with respect to substance abuse as far as the statutory factor, and then relied on that as a non-statutory mitigating factor. So let's say it was above, we find we're calling it correctly. I think that's correct. The judge kind of conflated it rather than distinctly looking at non-statutory mitigation. And so I think... You would agree, though, that we have to look at what the Arizona Supreme Court did because they engage in re-weighting in terms of the causal axis. That's correct, unless there's a question as to what they were doing. And I think that there were a couple places in the analysis of the Arizona Supreme Court where they glossed over the causal axis, and I think in that case that is when you would need to look at what the sentencing court actually did. For example, with mental health evidence, it talked about... It said that the Arizona Supreme Court said the trial court found that poisons have certain personalities, disorders, but did not cite any weight to this factor. When, in fact, what the sentencing court had done was it pointed out that because poison failed to establish a causal connection between its mitigation and crime, it did not constitute mitigating evidence. So I think what the Arizona Supreme Court did didn't fully take account of what the sentencing court was actually doing in applying the causal axis. So one thing that McKinney did cite, in addition to the Eddings error, is to conclude that the Eddings error is not structural. So would you move to the Harmel's error? Yes. Yes, I will. Thank you. We believe that Mr. Poisson... First of all, Mr. Poisson presented extensive evidence during sentencing that in a sentencing memorandum about his chaotic and traumatic childhood, his long personal and family history of alcohol and drug abuse, as well as his mental health problems. And so some of those factors, and I can give you the other sites as well, is both Mr. Poisson's mother and his biological father were heavy users of alcohol and drugs. His mother drank alcohol and used drugs successfully during her first trimester of pregnancy with him. At one point she admitted that she had used LSD and marijuana as often as she could get during that time. In addition, she continued to drink heavily and use marijuana throughout her pregnancy with him. Because of his prenatal exposure to alcohol and drugs, Mr. Poisson had neurological impairments that were consistent with FASD. As a practical matter, I mean, you're going through the facts. We're familiar with the facts. And that's what you were presented in the record. As a practical matter, the Supreme Court, it's the top decision-maker. It's the one that decides how much weight it's going to give to various facts. It looked at all the facts that it did, and it said it didn't give them much weight or any weight. Why is it going to be different? Because they now have to use different words because the Ninth Circuit has said these words don't work. Why is there really this potentially injurious effect with respect to the Arizona Supreme Court's determination? I think that the McKinney opinion, the court was clear that what the Arizona Supreme Court was doing all these years was it was only considering evidence to see whether or not there was a causal axis. Well, it knew there was evidence, correct? It recites the evidence. It knew the evidence was there. However, it did not have to doubt that it knew the evidence. So it doesn't look like it said, I won't look at this evidence. And so the court doesn't see the body decides. We've looked at this evidence, but we don't think it has a mitigating effect. I think the problem, and this was pointed out in the McKinney opinion, is that it did look at the evidence, but it only gave weight to evidence that meant causal axis to it. So it says, in our view as the Arizona Supreme Court, we think if there's not an axis between this background, these background history facts and the actual murder or the actual offense, we're not going to give it much weight or any weight. Why can't the state court that makes these decisions do that? I think there's a difference. I think that it's clear. It's systematic, right? I mean, I guess it's like you'd be honest and answer different good list layers of the Supreme Court going into a remand. I think that what needs to happen is that even that if this court finds that the sentence was actually invalidated, an invalid sentence, and I think that as we argue in our brief in Magwood, in Patterson and in Wilkerson v. Hodgson, the Supreme Court was clear that any time you grant a writ of habeas corpus, you're invalidating the underlying judgment, whether that is conviction or sentence. And if you're invalidating the underlying sentence in this case, then the only remedy is for this court to vacate the sentence, remand it with instructions to grant the writ. And then we say in Steyer's as a question of speak long, we allow the Arizona Supreme Court to just review it and correct the constitutional error. I think that Steyer's is distinguishable, Judge Akutu, because it involved a clemency error. In Steyer's, the Arizona Supreme Court instructed an aggravated, a statutory aggravated circumstance, and then failed to re-weigh the evidence that was already before it. And when you look at that, the Arizona Supreme Court is actually reviewing an already constitutional sentence. In this case, when the sentencing court was decided, the Supreme Court has never held that the issuance of a conditional writ of habeas corpus necessarily renders non-final a conviction or sentence and is predicated on constitutional error. We didn't say constitutional clemency error, we just said constitutional error. Well, I think in Steyer's, I think that Steyer's did not acknowledge the cases of Magwood or Wilkerson. It did not acknowledge any entries that are getting selected. I think that there is. Are they out by Steyer's? I think we're not bound by Steyer's. I don't think we're bound by Steyer's, mainly because we're involved in clemency error, which is different. Now, I think that it's arguable, and I'm not here to argue on behalf of Mr. Steyer's. I think it's arguable that in Steyer's, the officer should have gone back for a re-sentencing before a jury. However, this case is distinguishable because it did not involve clemency error. I think you would agree, though, that if that question turns, then whether the judgment is final or not. Right? That's correct. In terms of the writing analysis, if it's a non-final judgment, then it would go back to the jury. If it is considered intact for certain purposes, or if it were abandoned, it may well go back for judge sentencing or judgment against intermission. You know, Judge Charles, I think that if you are saying that the sentence is invalid, then the underlying judgment is invalid, and, in fact, the only remedy can be a new sentencing for a jury, and that's a new sentencing for a jury. You can't just send it back to the Arizona Supreme Court. And part of that is that the Arizona Supreme Court can be a finder. In fact, in the first instance, their only role on independent review is to review an already constitutional sentence, and Mr. Poisson's sentence that came before that court was non-constitutional. And so there's no way to know how a sentencer would have reviewed this evidence, considered it, and weighed it. I'm sorry. As we said, the whole thing was a question of state law that the Arizona Supreme Court would figure out in the first instance. Well, I think that it is up to the state court to make that determination. However, I think that the fact that this court has crafted different language in the remedies of these cases has created confusion in the state court and that it would be helpful to the state court if this court gave it guidance. For example, in Williams v. Ryan, the court there, basically they gave it a sentence regarding a man in order of a new resentencing. And in that case, Mr. Williams would have been given a new jury resentencing, and the state conceded as much in its McKinney brief. However, that case settled. Now, later in Stiers and then in McKinney, the language of the court as far as what was to happen was a little bit different. And when it went back to state court, the state prosecutors moved for the new independent review. Now, in Stiers, that could be viewed as acceptable because it was the Clemens error, which is unique, and it's unique to the error, and it's contained completely within the Arizona Supreme Court. In McKinney, we believe that was rightly decided and that it should have been a new jury resentencing in McKinney. So we believe that Williams is the better tack here and that that is what we would argue is appropriate. Or, in fact, we just reversed the district court. If we were to do that, because the martial morality is not before us necessarily, we could certainly remand and let the district court sort that out. That's correct. And so that's about seven minutes. If you want to reserve some time, we have a couple more topics you want to raise. And so, before you ask any other questions, I will reserve our time. Any further questions? All right. Thank you. Thank you. Good morning. My name is J.D. Nielsen. I want to allow us to push that point. I work for the Arizona Attorney General's Office. I represent the respondents at McKinney in this case. If I could, I would like to first address the harmless decision to move this argument to his benefit. I think we need, in this case, in order to determine whether or not the police need to have any sort of evidence on whether it was harmless, we need to look at the aggravation. And this is a case with very strong aggravation. We know it's a criminal homicide. We know two of the victims' murders were very brutal. One was very dramatic. It took 45 minutes. And we're also having some trouble with the ARB aggravator in this case. The only reason these three people were murdered was to conceal their victim. I urge you to distinguish this case from McKinney in terms of the aggravation factors. I think it's a much stronger case than McKinney. First, we have three homicides, and McKinney is one of ten. Well, two, yes. Well, excuse me. McKinney, I mean, I think there are three homicides. You have a horrific crime here. McKinney was a bad crime. I don't believe you. I don't think. I think there's more aggravation here, certainly based on the attitude of the victim, that's the young boy, murdered in two 45 minutes. We know his throat was slashed. A knife was pounded through his ear, came out his nose. He was bombed with rocks in the head, and his head was smeared against the roof. I don't think the aggravation here is stronger than McKinney. With respect to the mitigation evidence, and specifically the mental health evidence, which I think Mr. Green, who's an artist, has recognized this type of evidence, often is level-edged, I think we can go further in the analysis here, certainly to these things. There's been a couple of mitigations suggested. Poisson was impulsive. There's nothing impulsive about these crimes. We know that Poisson and these two defendants decided ahead of time that they would kill these victims in order to steal the drug. To the extent that his mental health mitigation suggests that he was unable to follow the law, that's inconsistent with the remedy. Poisson came in residence three to four months before the other. Two defendants showed up. Poisson was murdered. There's no evidence that Poisson engaged in any kind of activity at that time. Also, to the extent that his mental health mitigation suggests that perhaps he was unable to appreciate the lawfulness of his actions, again, that's contrary to the record here. We know he did what he did. He was wrong. The murdering of the highest two victims in this case, we see epitome for Poisson. It's a negative epitome for him. We also know that after the murder of the last victim here, Mr. Muir gave the body in order to degrade in order to avoid contaction. In the following examples, I think we also have something additional here. I would take it even farther and say that, too, the RSD is a very important and good and serious mental health mitigation. I see in Madison and Poisson, both of these mental health experts, in the pre-trial and trial, diagnosed him with the antisocial personality disorder. In his pre-trial mental health expert, who was also asked to examine his mental state at the time he committed the crimes, said he exhibits a less than dynamic mental personality type. This is a very stable personality pattern, and a poor prognosis for behavior changes in the present. Individuals such as Poisson should be deemed to have improvement in treatment. I do think that's important. I think it's hard for anyone to say that that would be some sort of mitigation. With respect to his trial and background, seeing the Supreme Court did not consider that evidence. I think a helpful way to look at it is to look at the way the recent appeal of this court in the apologies, which are given to watch one of the panel members there, talking about this type of information pointed out, trials and information may help us understand what created the monster, but it doesn't tell us anything about why the monster did what he did. In this case, I think... I'm sorry. In this case, the appeal is... The appeal is... I'm sorry, I don't have a scene for that. That's okay. I think we have evidence, which should appear in a lawful content of any of the trials. Certainly, I don't see what I can do is to make a major mitigation here against the strong aggravation. I don't see how Poisson can prove that it's the prejudice that he wants to underwrite. So what else do you want to discuss with us? I'm curious about your view on the remedy. Just let me assume we get that far, but... Well, I think, again, unless there's some reason you want to encourage me, absolutely, I think we have spires here, but we know under a broken glass reason for the decision, and that's the Supreme Court's opinion in this. And if we point here or there and we're saying, yeah, the Supreme Court there, and then they can't point here, I think from an irrational standpoint, that doesn't make a whole lot of sense. So if we were to... I realize you prefer us just to leave things as they were, but if we were to think that we could enhance the landscape and a proper remedy, in your view, would be to vacate the sentence and remand to the Arizona Supreme Court for grantee relief, you should raise your eyebrows when I said vacate sentence. Whatever we do with the sentence, you want it to go back to the Arizona Supreme Court to do a redo under the proper standard. That would be framed judicially. That's what they did in McKinnon. Yes, they did that in Spires, obviously. And, again, I think that makes sense. The Supreme Court, as I said, in Spires Court, the Supreme Court has never said that there's an additional word within these courts. I think it's somehow a vacancy. Banggood dealt with the definition of what a second-court success is. Maybe it's a petition, but I don't think there's anything in Banggood or in Banggood that seems and doesn't seem to be a constitutional rule. It certainly didn't seem as though it was a rule that just retroactively cases that are overrefined. With respect to leather, I'm not sure if there are any more questions on that. I mean, with respect to leather, I'm not sure if there was an edit there in this case. I mean, I think you can submit that there was calligraphy. It was in the language. Is there a way to distinguish McKinney? Well, McKinney calls this leather. Actually, he did one. He coordinated with the case in front of him. And I would certainly say that's being adjusted in here. With respect to McKinney signing the Arizona Supreme Court file, this is a possible next straw. We're bound by that, but we're also bound by a man, which is in the subsequent on-law panel that says under HIPAA, if you degrade a decision to court with federal law, you have to read it that way. So I think the combination of those cases, the behavior already framed in this court, the majority felt that they couldn't deal as a position, being able to decide whether or not the Arizona Supreme Court possible exit screening. If that's the case, then certainly under man and under rigor, there can be no relief. That is not exactly pretty much what we said in charge, which was overruled by McKinney. I'm sorry. Well, let me get a thing. When we had this case previously, we were bound by certain laws of time, which said a little higher bar or lower bar, depending on your point of view. McKinney has altered that considerably. So the fact that, again, in man, we said the statement in man doesn't really critique this particular issue. Well, man is talking with Robert, who is an analysis leader, who was talking about a way to proceed under a deferential analysis leader. As a subsection, the agency of McKinney's reliance, and I realize you disagree as McKinney, so you know that I have this problem, but it doesn't take too long there. What I would argue, though, under the Supreme Judiciary Court, is that there's a distinction between the presumption that the court's own efforts under subsection B, and I think man speaks to that. We start with the presumption that the court's own involvement in the law. And the next step is to decide which theories or arguments are justified for the state court's decision. And then the last step is whether or not reasonable jurists could differ on whether or not those legal arguments were consistent with the precedent. Well, is this really a contrary to or an unreasonable application case? Oh, it definitely is a contrary to the case. Ritter was a contrary to the case. Mann lied in a... I'm sorry, let me back up. This is a contrary to the case. Ritter is a reasonable application case. Mann is a contrary to the case. He lied in that case. Bottom line, well, it's a family decision. The bottom line... They would also argue in this case that the court needs not even to get into this case to just issue a mandate. That's based on federal rules and that's a federal procedure. We argue that 41B to the D is a default rule. That once it's in the Supreme Court, we should not even try to issue a petition for the case to sign. But that is usually the case when we've completed all of our work, but we have that pending penal petition for penalty hearing, which we reserve. If there's a Supreme Court case that requires a court to issue the mandate, well, there's a pending panel decision. So this was a 41... Your arguments were all about a 41D2. Yes. But this is a 41D1 case where the petition for penalty hearing on Baum had not been resolved. So it didn't appear to me that the cases you cited, which were 41D2 cases, were relevant to our procedural posture to find any cases that apply that same rule to a D1 case. So 41D1 is when you're saying the mandate pending the resolution of a petition for penalty hearing on Baum as opposed to a D2 case where you're saying and pending the resolution of a petition for cert. The issue, however, is that 41D2, the analysis of the general proposition that the court wants a cert petition is denied to the extent that 41D might be applicable. That's a poised argument. The mandate is even more untitled. You know, this court originally denied the petition to the re-hearing in November regarding Baum. I'm sorry, the re-hearing on Baum. The petitioner just said that the petitioner deemed Rule 41D one of the mandates was to be issued seven days after. That's a little bit of time whether from the comments to Rule 41B that that seven-day claim period is important. The comments, the 2002 comments, stress that the lady issued is to mandate nine days or more. The process is human-oriented procedures. I don't see how that could apply. I think this court is going to continue to be mandating this case. We also understand, according to the Supreme Court, that this court has no inherent authority with the new mandate. So, apparently, we have to go to the federal rules of procedure. The Supreme Court doesn't suggest or perhaps, except for the circumstances, it justifies the delay in entering a mandate. I've looked at the three cases, one from this circuit, usually one of the three, four through this circuit. They all seem to involve changes in statutory law that we have during the pendency and the circuit issue. You don't have that here. So how do you distinguish an elephant from the first-circuit case? Because in that case, the first-circuit concluded that it did not have to issue the mandate. There are pretty similar circumstances. Certainly, we can distinguish all these cases because I believe there are such cases. There are many such cases. In this case, it's a civil case. That's true. But in many of these cases, we have issues drawn from a circumstance like that that would be common. So I'm just saying you see that that distinguishes an elephant from a human being. So, yeah, I would ask this court to amend the issue of mandate in relation to the Supreme Court. Are there any other questions? If you want, thank you for your presentation, and thank you for coming here. Thank you. I'll first talk a little bit about the state's argument about the mandate. We raised this extensively in our reply, and I think that, yeah, as Judge Chavez pointed out, House Bill 237, the state was relying on one subsection, a federal appellate rule 41, and that was when service denial and gender mandate must issue. However, as the court pointed out, in this case, the court issued an order while Mr. Boyce had a service issuance pending on April 2nd of 2014. That's Target Entry 79. And in that, it omitted its order, saying that it actually upheld the denial of panel re-hearing, or a bonk, but allowed the panel re-hearing to go forward. And I think, according to the D1 section, as Judge Chavez pointed out, this court had authority to do that, and that there is no reason for the indication right away. This issue was before the court properly. In absence of the order that we issued, would you agree with the state that the mandate should have issued? No, because service is still pending. And that's after the denial was heard. I think that that's a rule, and I believe, I did address this in my brief. I believe the state was arguing that Chad stated that it was a mandatory rule, and in fact it was not, and then later conceded that. So, no, I don't think so. I think there's still discretion there. The second thing I wanted to address was prejudice, again, very quickly. There's no question about the aggravation circumstances in this case. However, the mitigation at issue here, the U.S. Supreme Court has found this kind of mitigation especially powerful mitigation and it's power to court-bound independence of youth, along with evidence of a turbulent family history, obedience by a parent, and emotional disturbance are particularly relevant. In Watkins, the Supreme Court found the failure to consider evidence for child abuse was unconstitutional. In Timothy, Texas, the failure to consider placement in special education and speech handicaps was unconstitutional and can re-evidence of a disadvantaged background and emotional and mental problems. In Watkins, evidence of physical abuse, sexual molestation, neglect, etc. How many of those were decided by a jury and how many were decided by the Supreme Court? I cannot tell you off the top of my head. I apologize, Pat. Because, obviously, if the jury was instructed not to consider certain evidence as mitigating, that would be different than a Supreme Court, a state Supreme Court, doing a review in the first instance. Do you know of a review? I don't follow. I guess what I'm speaking to, Judge Akuda, is the fact that this kind of mitigating evidence is considered to weigh very heavily by the U.S. Supreme Court. But the Arizona Supreme Court was aware of the absence. I'm sorry. It did instruct itself as to whether to consider it or how much weight to give it. Whereas a jury would be not believed to follow the instructions of the judge of the court. Well, and again, I think that the Arizona Supreme Court was bound by its own law. Because otherwise, it could change the law, right? It could change its rule. Well, it was following its own law, according to McKinney. And it was not following federal constitutional law. I also think that this is Mr. Poisson's case. It's very similar to the case of James McKinney and Michael Hepland. All three of these people suffered traumatic childhoods, had alcohol appearance, were neglectful, unviolent. Mr. McKinney was a person who began to withdraw when he was 11 and began using drugs and alcohol. McKinney and Hepland suffered from PTSD. Poisson suffered from the effects of prenatal exposure to alcohol and drugs. Both cases involved multiple victims. McKinney already gave his guilty. I think that there can be no recent basis to distinguish Mr. Poisson's case from the cases of McKinney and Hepland, which have been granted relief. Just one brief point. Mr. Nielsen pointed out that in several months that Mr. Poisson lived, in the trailers with Ms. Kagan and the others, that nothing had happened. There was no criminal activity. There was no violence. There was no desertion whatsoever. I think that is an important point that he lived very peacefully with these people without incident until the co-defendant, Frank Anderson, came really clean. But mainly Frank Anderson came into the picture and within days this crime occurred. And then finally, just one small point. Mr. Nielsen, why does that make a difference? I guess I don't follow that. I think he was making something of the fact that his mitigation doesn't warrant any weight because I'm not exactly sure. All I'm saying is the fact is that he lived very peacefully without incident. It wasn't until he was under the influence of an older man who prompted this crime and in fact was the first instigator of the first act of this crime. And then just very quickly, the state and MAM, which the state again relied on and noticed this court in the 2018 letter, MAM also required a compromise which was impermissible and that was pointed out in the case in the beginning. Thank you. Thanks for your argument. Thank you as well for trailing here. I know both of you have been with this case for a long time and we appreciate your efforts. Capital cases are complicated and sometimes require a really in-depth review of the record and both of you indicated that you really had the record. Thank you very much for your presentation. In case you're starting to be submitted for a decision that you'll be in recess.
judges: Thomas, Fisher, Ikuta